# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 15, 2011

Decided August 5, 2011
Reissued August 12, 2011

No. 10-7085

ESTATE OF MARK PARSONS, ET AL.,
APPELLANTS

v.

PALESTINIAN AUTHORITY, ALSO KNOWN AS PALESTINIAN
INTERIM SELF-GOVERNMENT AUTHORITY AND PALESTINIAN
LIBERATION ORGANIZATION, ALSO KNOWN AS PLO,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01847)

———

*Edward MacAllister* argued the cause for appellants. With him on the briefs were *Richard D. Heideman*, *Tracy Reichman Kalik*, and *Steven R. Perles*.

*Laura G. Ferguson* argued the cause for appellees. With her on the brief were *Mark J. Rochon* and *Matthew T. Reinhard*. *Charles F. McAleer, Jr.* and *Timothy P. O'Toole* entered appearances.

Before: HENDERSON, TATEL, and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* BROWN.

TATEL, *Circuit Judge*:   While providing security for a U.S. State Department convoy in the Gaza Strip, Mark Parsons was killed by a roadside bomb. Parsons's estate and his family sued the Palestinian Authority under the Anti-Terrorism Act of 1991, alleging that the Authority had provided material support for and conspired with the terrorist or terrorists who detonated the bomb. Concluding that the Parsons family had produced insufficient evidence to create genuine disputes of material fact on these Anti-Terrorism Act claims, the district court granted summary judgment to the Palestinian Authority. Although we agree with the district court that the family's conspiracy claim theories are too speculative to survive summary judgment, we believe a reasonable juror could conclude that Palestinian Authority employees provided material support to the bomber. Accordingly, we affirm with respect to the conspiracy claim but reverse as to material support.

## I.

In the midst of the Second Intifada, on October 15, 2003, a United States Department of State convoy traveled through the Gaza Strip on the way to interview Palestinian Fulbright Scholarship applicants. Besides State Department officials,

the convoy included a Palestinian Authority Civil Police car in the lead position and DynCorp International employees under contract with the State Department to provide security. While the convoy traveled along Salahadeen Road, approximately 20 meters—or about one-fourth of a city block—from a manned Palestinian Authority security checkpoint, a roadside bomb exploded, killing DynCorp employee Mark Parsons and two of his co-workers.

Immediately after the bombing, Palestinian Authority security and police forces took control of the site, gathered forensic evidence, and launched an investigation run by the Palestinian Authority's Preventive Security Services. United States and Israeli authorities also launched their own investigations.

During its investigation, the Palestinian Authority detained and interrogated six suspects, "a number of" whom, according to the official having overall responsibility for the investigation, "admitted to possessing and planting explosive charges in the past, targeted at Israeli military incursions into Gaza." One of those suspects was Amer Qarmout, a leader of the Popular Resistance Committees ("PRC"). During his interrogation, Qarmout recounted how, two or three days prior to the bombing, he supervised the digging of a hole on Salahadeen Street in which he planned to place a bomb. Qarmout and "fellow members in the Resistance" dug the hole "in front of the [Palestinian Authority] National Security Service." Qarmout explained: "I introduced myself to the National Security soldiers and asked them to turn their attention from the young men who were planting the device." But denying he ever planted a bomb, Qarmout claimed that after the "explosion targeting the US convoy took place . . . I called Joma'a Abou Loze[, who had helped dig the hole,] and

asked him not to move about in the place and not to plant the device because of the dangers involved."

Qarmout also admitted to having possessed three bombs one month prior to the bombing. He described the bombs as using detonating cables, employing urea as the explosive material, and weighing 30 to 35 kilograms, 20 to 25 kilograms, and 10 to 12 kilograms. According to Qarmout, it was the 12 kilogram bomb that he had intended to plant on Salahadeen Road.

In the course of their investigations, the Palestinian Authority and the FBI conducted forensic analyses of the bomb that killed Parsons. Both determined, among other things, that the bomb contained urea nitrate. The Authority's analysis added that the bomb weighed approximately 30 to 40 kilograms and was detonated using cables. Moreover, a memo found in the Palestinian Authority's investigative file concludes, based on "[t]he lid of the device, the type of detonator, the cables used, the poorly connected batteries, the type of explosive material, [and] the outer casing of the device[,] . . . that the structure of this device is the same structure used by the Popular Resistance Committees."

To this day, neither the Palestinian Authority nor Israel nor the United States has publicly identified the bomber. The reason, according to the Palestinian Authority, is that all three investigations remain open and the "identity of the individuals or group responsible for planning and carrying out the bombing has never been determined." Appellees' Br. 2. The Parsons family disputes whether the Palestinian Authority has indeed failed to identify those responsible for the attack.

Nearly four years after the bombing, Parsons's estate, his siblings, and his parents' estate filed this lawsuit in the U.S.

District Court for the District of Columbia against the Palestinian Authority and the Palestinian Liberation Organization, alleging that each organization was at least partially responsible for the attack. Although the family's complaint raised several claims, at issue in this appeal are just two, both brought under the Anti-Terrorism Act of 1991 against the Palestinian Authority (but not the Palestinian Liberation Organization) for allegedly providing material support to and conspiring with the terrorist or terrorists who set and detonated the bomb. In support of these claims, the Parsons family advanced several theories for linking the Palestinian Authority to the attack, only three of which are relevant to this appeal: that Palestinian National Security forces at the nearby checkpoint agreed to look the other way while the bomb was planted; that Authority personnel tipped off the bomber about the convoy; and that the Authority provided weapons to the bomber.

Among the evidence the Parsons family offered to prove these theories, three documents, discovered in the Palestinian Authority's investigative file and that the parties and the district court have thus far treated as admissible, are central to this case. The first document (quoted above) is Qarmout's statement to Palestinian Authority interrogators in which Qarmout admits that he prepared to plant a bomb on Salahadeen Road in approximately the same location as the bomb that killed Parsons. In that statement, Qarmout also describes the three bombs he possessed in the month prior to this attack. The second piece of evidence (also referenced above) is the FBI's forensic report. Lastly, the family relied on a two-page memo having an unidentified author addressed to the "Director General of the Preventive Security Service," the significance of which the parties forcefully debate. In a section titled "Conclusion and personal interpretation of what happened according to the information in my possession," the

memo includes several statements about the role Palestinian Authority employees played in the bombing including:

- "The explosive device was planted 20 meters away from the National Security checkpoint, a fact that indicates that those present in front of the checkpoint that day have previous knowledge of the presence of the device."

- "[A]fter information of the arrival of US embassy staff was leaked, either by the National Security personnel at the checkpoint or by those who were accompanying the convoy, the person responsible for the explosion detonated the device."

The memo also includes several observations about the bomb, *see supra* at 4, as well as two statements about when the device was prepared and buried:

- "After examining the material used, we learned it had been prepared more than twenty days earlier and that a substantial portion of the nitric acid had been lost, separated from the urea, and reacted with the iron in the outer casing."

- "As we mentioned above, the device was present for 20 days at least . . . ."

In addition, the Parsons family claimed they could prove that Amer Qarmout and/or the Popular Resistance Committees directly carried out the attack. Moreover, the family insisted that even if they were unable to identify the

actual bomber, they could nonetheless prevail so long as they could show what role the Palestinian Authority had played.

The district court, focusing on the three items of evidence, granted the Palestinian Authority's motion for summary judgment. The court first held that plaintiffs advancing material support claims under the Anti-Terrorism Act must identify "what terrorist organization or individual carried out the attack." *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 31 (D.D.C. 2010). Concluding that no reasonable juror could find, based on the family's admissible evidence, that Qarmout, the PRC, or any other specific terrorist or terrorist organization was directly responsible for the bomb, the court rejected the family's material support claim. Although agreeing that the family need not prove the bombers' identity for their conspiracy claim, the court nonetheless rejected that claim as well, reasoning that the admissible evidence linking the Palestinian Authority to the attack was too speculative. The Parsons family now appeals. Our review is de novo. *See Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) (explaining that we review summary judgment decisions de novo).

## II.

The Parsons family brought their material support and conspiracy claims under the civil liability provision of the Anti-Terrorism Act of 1991, which gives United States nationals killed or injured "by reason of an act of international terrorism" (or their estates, survivors, or heirs) the right to bring a civil lawsuit in federal court. 18 U.S.C. § 2333. The Act defines "international terrorism" as activities that, among other things not relevant to this appeal, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the

jurisdiction of the United States or of any State." *Id.* § 2331(1)(A). In other words, to prevail, a plaintiff must prove the defendant would have violated any one of a series of predicate criminal laws had the defendant acted within the jurisdiction of the United States. Here, the Parsons family alleges that the Palestinian Authority violated two federal criminal statutes: 18 U.S.C. § 2339A, which makes it a crime to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" specific violent crimes, including 18 U.S.C. § 2332, which prohibits the killing of a United States national outside the United States; and 18 U.S.C. § 2332(b), which makes it a crime to conspire to kill a United States national outside the United States. The family's Anti-Terrorism Act claims thus turn on whether they can prove the elements of either section 2339A (the material support claim) or section 2332(b) (the conspiracy claim). In this opinion, we consider the material support claim and announce our judgment with respect to the conspiracy claim.

### *Material Support*

The family first disputes the district court's interpretation of section 2339A as requiring them to identify the actual bomber. The family may prevail, they claim, so long as they show that the Palestinian Authority provided material support to *whoever* directly carried out the attack. On this point, the Palestinian Authority never directly challenges the family's statutory analysis, and for good reason. As the family correctly observes, "[t]he emphasis in 18 U.S.C. § 2339A is upon the material support provider—'whoever provides material support or resources'—not the recipient . . . ." Appellants' Br. 18.

That said, the family's theory that Amer Qarmout planted and detonated the bomb and that Palestinian Authority

employees gave him material support to that end, would, if proven, at least be sufficient to sustain their material support claim. Accordingly, we first consider whether a reasonable juror could so conclude, starting with the question of whether the family's evidence that Qarmout planted and detonated the bomb is sufficient to survive summary judgment.

Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science. Under Federal Rule of Civil Procedure 56, the court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But what makes for a "genuine" factual dispute? The Supreme Court answered that question in *Anderson v. Liberty Lobby, Inc.*, explaining that the "mere existence of a scintilla of evidence . . . will be insufficient" to defeat summary judgment. 477 U.S. 242, 252 (1986). Applying that standard requires us to examine both the "caliber" and the "quantity" of the family's evidence "through the prism of the substantive evidentiary burden,"—for these claims, the preponderance of the evidence standard. *Id.* at 254. That said, *Liberty Lobby* also warns against "denigrat[ing] the role of the jury." *Id.* at 255. To that end, the Supreme Court emphasized, "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

We believe that the Parsons family's evidence is sufficient to meet this burden with respect to whether Qarmout planted and detonated the bomb. Qarmout himself admitted that two or three days prior to the attack, he prepared to plant a bomb in the approximate location of the bomb that

killed Parsons. Qarmout also said that around the time of the killing he possessed a bomb that weighed 30 to 35 kilograms, employed urea as the explosive, and used cable detonators. The bomb described by the FBI and the Palestinian Authority's analyses largely matches that profile. Both describe a bomb employing urea nitrate as the explosive material, and the Authority analysis reports that the bomb weighed 30 to 40 kilograms and used cable detonators. Moreover, the memo in the Palestinian Authority's investigative file concludes that "the structure of this device is the same structure used by the Popular Resistance Committees"—the very same terrorist organization of which Qarmout was a leader.

The district court took note of most of this evidence, acknowledging that "[e]vidence that someone prepared to do something [i.e., that Qarmout prepared to plant a bomb] is of course relevant to the question of whether the person actually did it," *Estate of Parsons*, 715 F. Supp. 2d at 32, that the memo's conclusion linking the bomb to the Popular Resistance Committees "is essentially of a factual nature and does have some relevance, as it tends to show a pattern or practice by the PRC," *id.*, and that "[t]here is also evidence that Qarmout is a PRC member, so it may be sensible to consider the evidence related to Qarmout and the PRC together," *id.* at 33 n.4. Even so, the district court found this evidence insufficient. Qarmout's admissions were not enough "in light of his denial of actually orchestrating the bombing." *Id.* at 32. Moreover, "[t]here is at least some indication that the bomb had been present for 20 days prior to the explosion . . . contrary to Qarmout's account" that he was preparing to plant a bomb only two or three days prior to the attack. *Id.* at 32 n.2. As for the Palestinian Authority memo, because it "is undated and anonymous, its weight is minimal." *Id.* at 32. And in any event, "the bare fact that the bomb used resembles

PRC bombs of the past adds so little weight to the Qarmout evidence that the evidence remains insufficient to establish the identity of the bomber." *Id.* at 33 n.4.

Supplementing the district court's analysis, the Palestinian Authority argues that in light of Qarmout's history of targeting the Israeli military "[t]here is no evidence that Qarmout would have targeted a U.S. diplomatic convoy." Appellees' Br. 37. At oral argument, the Authority also pointed to Qarmout's statement that he intended to plant his 12 kilogram bomb, not the 30 to 35 kilogram one. Recording of Oral Arg. 17:54–18:57.

Although these evidentiary criticisms certainly have force, they are, given the teachings of *Liberty Lobby*, more properly directed to the jury. In our view, a reasonable juror could conclude that Qarmout never planted a bomb; that the actual bomb had been in the ground for twenty days, long before Qarmout began digging his hole; that Qarmout planted a different bomb; or even that he planted the bomb to target Israelis but never detonated it. A reasonable juror, however, could also believe Qarmout's incriminating statements but disbelieve his exculpatory ones, and thus conclude that he lied about calling off the bombing. Likewise, a reasonable juror could find that Qarmout planned to and did plant the 30 to 35 kilogram bomb that had been in his possession, as opposed to the 12 kilogram bomb referred to in his statement. And it would hardly be unreasonable for a juror to conclude that the reference in the Palestinian Authority memo to the bomb having been in the ground for twenty days was a misstatement and that in fact the memo's author meant to write only that the bomb had been prepared, but not necessarily planted, twenty days earlier. After all, the memo first says the bomb "had been prepared more than twenty days earlier," meaning that its later statement—"as we mentioned above, the device was

present for 20 days at least…"—could be read as only cross-referencing that earlier statement. Sorting out these contradictions, deciding how much weight to give evidence that supports or undermines the family's case, and evaluating how much credibility to assign Qarmout's incriminating versus exculpatory statements are prototypical jury functions that courts may not commandeer. *Liberty Lobby*, 477 U.S. at 255. We therefore conclude that the Parsons family has demonstrated the existence of a genuine dispute of material fact as to whether Qarmout was the bomber.

The Authority next disputes on both evidentiary and legal grounds whether the family can show that the Palestinian Authority provided Qarmout with material support. As for its evidentiary objection, the Authority questions any assertion that the National Security personnel at the checkpoint complied with Qarmout's request to "turn their attention" away from the planting of a bomb. It points out not only that Qarmout's statement makes no mention of whether and how the guards responded, but also that Qarmout describes only a conversation while he was digging a hole, not during the more serious activity of planting a bomb. Moreover, relying on another passage in Qarmout's statement in which he describes how personnel at a different National Security checkpoint thwarted one of Qarmout's previous bomb-planting missions, the Authority argues that the personnel at this checkpoint would have stopped Qarmout from planting a bomb. Appellees' Br. 38.

Once again, such evidentiary arguments are properly addressed to the jury, not to the court. Recall that at summary judgment the non-moving party is entitled to all "justifiable inferences" in its favor. *Liberty Lobby, Inc.*, 477 U.S. at 255. Here, a reasonable juror could justifiably infer from Qarmout's statement and from the fact that the checkpoint

was only 20 meters from the bomb site that in response to Qarmout's request, the Palestinian Security forces stationed there either expressly, or implicitly through their actions, agreed to and did "turn their attention" from Qarmout's bomb planting activities.

The Authority accuses the family of failing to "parse the language of the material support statute" or to "cite any legal authority" establishing that complying with Qarmout's request to look the other way while he planted a bomb, constituted material support within the meaning of section 2339A. Appellees' Br. 43. The family responds that the security forces' conduct falls under two categories listed in section 2339A(b)(1)'s definition of "material support or resources"—namely, "service" and "personnel." 18 U.S.C. § 2339A(b)(1).

We begin with "service." Although section 2339A nowhere defines that term, the Supreme Court provided a definition just last year in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), a case involving a closely related material support statute, section 2339B, that outlaws "knowingly provid[ing] material support or resources to a foreign terrorist organization." 18 U.S.C. § 2339B(a)(1). There, the Court explained that "service" "refers to concerted activity" (as opposed to "independent activity") and carries its "ordinary meaning"—i.e., " 'the performance of work commanded or paid for by another: a servant's duty: attendance on a superior'; or 'an act done for the benefit or at the command of another.' " *Humanitarian Law Project*, 130 S. Ct. at 2721–22 (quoting Webster's Third New International Dictionary 2075 (1993)). Although the Court defined that term in the context of a different statute than the one we deal with here, we generally presume, absent some indication to the contrary, that Congress intends identical terms to have

identical meanings in related provisions, and no such indication exists here. *See Comm'r v. Lundy*, 516 U.S. 235, 249–50 (1996). Moreover, defining "service" differently in sections 2339A and 2339B seems particularly inappropriate given that the latter provision expressly borrows its definition of "material support or resources," including "service," from the former. *See* 18 U.S.C. § 2339B(g)(4). Indeed, when discussing "service" in *Humanitarian Law Project*, the Court cites not only to section 2339B, but also to section 2339A's material support definition. *Humanitarian Law Project*, 130 S. Ct. at 2721–22 (citing 18 U.S.C. § 2339A(b)(1)).

Assuming, as we must at this stage of the litigation, that the checkpoint personnel acted as the Parsons family claims, we think the security forces' conduct falls comfortably within *Humanitarian Law Project*'s definition of "service." As security personnel assigned to a checkpoint, they were presumably responsible for preventing terrorists from planting and detonating bombs nearby. Moreover, they allegedly acted in response to Qarmout's request. In effect, then, at a terrorist's behest, these security officers agreed to and did affirmatively remove the threat that local law enforcement officers would themselves interfere with the terrorist's efforts to plant a bomb—actions functionally the same as distracting a beat-cop so that someone else can safely break the law without police intrusion. Because that is surely an act done in concert with and for the benefit of a terrorist, it constitutes providing a "service" and therefore material support within the meaning of section 2339A.

Given this conclusion, we need not address the trickier question of whether the security forces' alleged conduct also constitutes providing "personnel." We say trickier because we are at least unsure whether that conduct qualifies as providing "personnel" as section 2339B defines that term and because

although some courts have concluded that "personnel" has a different and broader meaning in section 2339A, at least one of those courts has also acknowledged the existence of strong arguments to the contrary. *See United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 399–400 (D. Conn. 2009) (concluding that one can provide "personnel" for the purposes of section 2339A so long as there is some form of coordination, joint action, or shared understanding between the personnel provider and the terrorist but acknowledging arguments for applying section 2339B's narrower definition, which expressly requires working, or providing others to work, under a terrorist's "direction or control"); *see also United States v. Abdi*, 498 F. Supp. 2d 1048, 1057–58 (S.D. Ohio 2007). We, however, shall leave resolution of that issue for another day.

In sum, we conclude that a reasonable juror could find on the basis of the family's evidence that Qarmout planted the bomb that killed Parsons and that Palestinian Security forces at the nearby security checkpoint complied with Qarmout's request not to interfere with his effort to plant a bomb. Because such acts qualify as providing material support under section 2339A, we reverse the district court's grant of summary judgment to the Palestinian Authority on the family's material support claim. Having reached this conclusion, we have no need to consider the Parsons family's other evidentiary theories with respect to their material support claim. We note, however, that because the panel is divided on the issue, we have reached no binding decision about whether the Parsons family has shown a genuine dispute of material fact as to the scienter element of their material support claim. *See* 18 U.S.C. § 2339A (criminalizing the provision of "material support or resources . . . *knowing or intending* that they are to be used in preparation for, or in carrying out, a violation of" specific violent crimes, including

18 U.S.C. § 2332, which prohibits the killing of a United States national outside the United States (emphasis added)); *compare* Opinion of Judge Henderson 1–10 ("Henderson Op.") (concluding that the Parsons family has failed to satisfy the scienter element), *with* Opinion of Judge Brown 1–8 ("Brown Op.") (concluding that the Parsons family has demonstrated a genuine dispute of material fact as to the scienter element), *with* Opinion of Judge Tatel 10–12 ("Tatel Op.") (treating as forfeited any argument that the Parsons family has failed to satisfy the scienter element).

### *Conspiracy*

We affirm the district court's grant of summary judgment as to the family's conspiracy claim. *See* Henderson Op. at 1 n.1, 11; Tatel Op. at 1–10. *But see* Brown Op. at 8–21.

### III.

Finally, the Parsons family argues in the alternative for additional discovery, a request the district court denied. Although we find no abuse of discretion in that decision with respect to the family's conspiracy claim, *see Dunning v. Quander*, 508 F.3d 8, 9 (D.C. Cir. 2007) (per curium), the district court may well view the need for additional discovery on the material support claim differently in light of this opinion. We therefore leave this issue to the district court to consider in the first instance on remand.

*So ordered*.

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part:

The Anti-Terrorism Act (ATA or Act) authorizes a United States national (or his estate, survivors or heirs) injured "by reason of an act of international terrorism" to sue in federal court for money damages. 18 U.S.C. § 2333(a). The Act defines "international terrorism" as activities that, as relevant here, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A). To prevail, therefore, the plaintiffs (Parsons family) must show that defendant Palestinian Authority (PA), had it acted within the jurisdiction of the United States or of any State, would have violated a criminal law of the United States or of the State. On appeal, the Parsons family alleges two such violations: (1) the PA provided material support for the killing of a U.S. national in violation of 18 U.S.C. § 2339A and (2) the PA conspired to kill a U.S. national in violation of 18 U.S.C. § 2332(b). I would affirm the district court on the alternative ground that the Parsons family has failed to establish the scienter requirement of sections 2339A and 2332(b). Accordingly, I respectfully dissent in part.[1]

I take no exception to the majority opinion's explanation of the underlying facts. My disagreement is legal, not factual. Section 2339A criminalizes the provision of "material support or resources . . . *knowing or intending* that they are to be used in preparation for, or in carrying out, a violation of" certain criminal statutes. 18 U.S.C. § 2339A(a) (emphasis added). One criminal statute—18 U.S.C. § 2332—prohibits the killing of a U.S. national outside the United States. Section 2339A makes clear that providing material support or resources alone is not

---

[1] I join the judgment affirming the summary judgment grant to defendant Palestinian Authority on the Parsons family's conspiracy claim.

sufficient to constitute a violation. The criminal defendant must provide material support or resources "knowing or intending" that the resources "are to be used in preparation for, or in carrying out," the underlying crime—here, the killing of a U.S. national outside the United States. 18 U.S.C. § 2339A(a); *see also United States v. Stewart*, 590 F.3d 93, 113 (2d Cir. 2009) ("Section 2339A . . . does not penalize the provision of material support without regard to what the support is for. [It] requires instead that the defendant provide support or resources *with the knowledge or intent* that such resources be used to commit specific violent crimes." (emphasis in original)); *id.* at 113 n.18 ("Section 2339A criminalizes the provision of material support *knowing or intending* that such support is used to aid crimes of terrorism. Therefore, the mental state in section 2339A extends both to the support itself, and to the underlying purposes for which the support is given." (emphasis in original) (internal citation omitted)). For a criminal violation of section 2339A, then, specific intent is required. *See Humanitarian Law Project v. Mukasey*, 552 F.3d 916, 927 (9th Cir. 2009) (section 2339A requires defendant to act with specific intent), *aff'd in part & rev'd in part on other ground sub nom. Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010).

The knowledge required to violate section 2339A in the context of the ATA's *civil* liability provision, 18 U.S.C. § 2333(a), has been subject to debate. The Seventh Circuit, sitting en banc, held that criminal recklessness suffices. *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 693 (7th Cir. 2008) (en banc). The defendants in *Boim* were accused "of having provided financial support to Hamas," which organization killed David Boim, a U.S. national living in Israel. *Id.* at 687-88. The court compared criminal recklessness—which " 'generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware' "—to civil recklessness—which "sometimes connotes merely gross negligence and at other times requires

only that the defendant have acted in the face of an unreasonable risk that he should have been aware of even if he wasn't"—and concluded that criminal, not civil, recklessness is required to violate sections 2339A and 2332, as incorporated into section 2333(a). *Id.* at 694 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *id.* at 693 ("[I]t would not be enough to impose liability on a donor for violating section 2333, even if there were no state-of-mind requirements in sections 2339A and 2332, that the average person or a reasonable person would realize that the organization he was supporting was a terrorist organization, if the actual defendant did not realize it."). By way of example, the court noted that "giv[ing] a small child a loaded gun would be a case of *criminal* recklessness" because "the giver would know he was doing something extremely dangerous and without justification." *Id.* at 693 (emphasis in original). Similarly, the court explained,

> [a] knowing donor to Hamas—that is, a donor who knew the aims and activities of the organization— would know that Hamas was gunning for Israelis . . . , that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel . . . and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel.

*Id.* at 693-94. In other words, the court concluded that knowingly donating money to Hamas is a criminally reckless act sufficient to violate sections 2333(a), 2339A and 2332. Three dissenting judges found the court's reasoning "awfully vague" and accused the court of "slid[ing] over the statutory requirement . . . that the entity providing material assistance must know that the donee plans to commit terrorist acts against U.S. citizens." *Id.* at 725 (Wood, J., dissenting); *see also Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 664-65 (S.D. Tex. 2010) ("[I]t is not enough [that provider of material support or

resources] know the character of the ultimate [recipient of the support or resources].  The defendant must know (or intend) that its money is going to a group engaged in terrorist acts or is being used to support terrorist acts.  Because civil liability under the ATA is restricted to American victims, the defendant must also know (or intend) that the terrorism or terrorist group it is supporting targets Americans."); *cf. United States v. Stewart*, 590 F.3d 93, 113 & n.18 (2d Cir. 2009).

I express no opinion on the Seventh Circuit's application of criminal recklessness to establish civil liability under the ATA for a violation of section 2339A because the Parsons family failed to establish even criminal recklessness.  Significantly, the *Boim* court's determination that the donors acted recklessly relied on "State Department data that in 1999 there were about 184,000 American citizens living in Israel, accounting for about 3.1 percent of the country's population."  549 F.3d at 694.  The record here contains no data suggesting a similar American presence in Gaza.  Instead, the record indicates that Israelis, not Americans, were likely the intended targets of the bomb.  *See* ▓▓ Decl. ¶ 19 ("[A] number of the individuals arrested and interrogated" by the PA after the explosion "admitted to possessing and planting explosive charges in the past, *targeted at Israeli military incursions into Gaza*." (emphasis added)).[2] That Israeli tanks arrived shortly after the explosion to secure the area reinforces the inference.  *See id.* ¶ 10.  The only evidence that links the PA's alleged provision of material support to the killing of a U.S. national is the "[c]onclusion and personal interpretation" of the anonymous author of an undated two-page memorandum to the "Director General of the

---

[2] ▓▓▓▓▓ was ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Gaza" at the time of the explosion.  ▓▓ Decl. ¶ 7.  In that role he ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ into the event. *Id.* ¶ 8.

Preventive Security Service" that PA personnel—either those at the checkpoint or those in the lead car of the convoy—"leaked" "information of the arrival of US Embassy staff" to whoever detonated the bomb.[3]   Sealed App. 305.   To accept the conclusion that PA personnel notified the bomber of the arrival of the U.S. convoy "would require piling inference (about the reliability and knowledgability of the statement's author) upon inference (about when the statement was written) upon inference (about the statement's evidentiary basis)[]akin more to speculation than to reasonable fact-finding" and " '[t]he possibility that a jury might speculate in the plaintiff's favor . . . is simply' insufficient to defeat summary judgment."[4] Concurring Opinion of Judge Tatel (Tatel Op.) at 4 (quoting *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010)).

Judge Brown contends that the two-page memorandum is an "official government record" that is "entitled to a

---

[3] Judge Brown urges that a statement by a former head of the PSS that Palestinian security forces aided Hamas and martyred themselves during the Second Intifada "tends to support [the] conclusion" that PA personnel at the security checkpoint at least disregarded the risk that their conduct would aid in the killing of Americans.  Opinion of Judge Brown at 7.  The PSS official's statement is an English translation found on the website of Palestinian Media Watch, an Israeli research institute, of an excerpted news clip from 2007.  Assuming *arguendo* the website accurately translated the statement, the statement does not suggest that PA personnel would have known the bomb would target Americans.

[4] I find the Parsons family's claim speculative for another reason. For PA personnel at the checkpoint—and even more so, in the convoy—to have "tipped" the bomber to the U.S. embassy staff's arrival means that those personnel had to have calibrated with pinpoint accuracy that the explosion would not affect them—otherwise, they risked their own lives as well.

presumption of regularity." Opinion of Judge Brown (Brown Op.) at 5 (citing *PNC Fin. Servs. Grp., Inc. v. Comm'r*, 503 F.3d 119, 123 (D.C. Cir. 2007)). The government record in *PNC* was an official tax receipt of the Brazilian government marking the payment of a specific tax. *PNC*, 503 F.3d at 123. The relevant portion of the memorandum, in contrast, does not purport to memorialize the occurrence of a specific event but to offer a "[c]onclusion and personal interpretation." Sealed App. 305. Because the document is unsigned and undated we cannot reasonably assume it represents the PA's official position. We can assume only that it represents what it purports to represent—the "[c]onclusion and *personal interpretation*" of its author.[5] *Id.* (emphasis added).

---

[5] I disagree with Judge Brown that the ███ Declaration supports inferences favorable to the Parsons family regarding the reliability and knowledgability of the memorandum's author. *See* Brown Op. at 4-5. The relevant portion of the ███ Declaration states:

> The PSS kept an investigative file documenting the investigation, interviews, interrogations and the forensic analysis provided by the FBI. Copies of those files were provided to counsel for the PA and PLO in this matter, and I understand copies were then provided to Plaintiffs' counsel. I was responsible for collecting, assembling, and producing the investigative file produced in this matter and for verifying that the records produced are authentic copies of records kept in the course of the investigation into the bombing.

███ Decl. ¶¶ 17-18. ███ statement that he was responsible for verifying that the records were "authentic copies" does not mean that he also verified the substance of each record. It means only that he verified that the records provided to counsel for the PA and PLO were accurate reproductions of records held by the PSS—without necessarily endorsing any statements or conclusions in those records. After the above-quoted passage, moreover, the Declaration discusses—in several paragraphs that all begin "I have reviewed the

The other precedent Judge Brown relies on applied the presumption of regularity to the actions of American governmental officials—not foreign officials. *See Musengo v. White*, 286 F.3d 535 (D.C. Cir. 2002) (Army officers); *Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989) (President of the United States); *S. Pac. Commc'ns Co. v. AT&T*, 740 F.2d 980, 994-95 (D.C. Cir. 1984) (judge), *cert. denied*, 470 U.S. 1005 (1985); *McSurely v. McClellan*, 697 F.2d 309, 323-24 (D.C. Cir. 1982) (same), *cert. denied*, 474 U.S. 1005 (1985); *Jones v. United States*, 342 F.2d 863, 884 (D.C. Cir. 1964) (en banc) (grand jury). These cases, moreover, applied the presumption to establish that the officials followed the appropriate procedures when performing their official duties, *see, e.g.*, *Am. Fed'n of Gov't Emps.*, 870 F.2d at 727-28, not to lend credence to their "conclusions, inferences, and subjective judgments," *see* Brown Op. at 5. That courts presume, absent clear evidence to the contrary, duly elected or appointed American governmental officials act correctly and in compliance with applicable law does not suggest that a similar presumption attaches—or should attach—to the admittedly personal interpretation of an anonymous investigator in one of the most chaotic and irregular regions of the world.

The memorandum does not explain, moreover, why it concludes that PA personnel "leaked" news of the U.S. convoy's arrival. The relevant portion of the memorandum states in full:

---

investigative file . . . ."—the evidence contained in Qarmout's statement, a "true and correct copy" of which is attached to the Declaration as exhibit 1. *See id.* ¶¶ 19-22. In contrast to the extensive discussion of Qarmout's statement, the Declaration does not mention the memorandum. Nor is the memorandum attached as an exhibit to the Declaration, as Qarmout's statement is. Accordingly, I find nothing in the █████ Declaration that supports the reliability or authoritativeness of the memorandum.

As we mentioned above, the device was present for 20 days at least, which means that the device was planted either after the problem with Ismail Hameed or it was planted for one of the vehicles of the Israeli occupation army. However, after information of the arrival of US Embassy staff was leaked, either by the National Security personnel at the checkpoint or by those who were accompanying the convoy, the person responsible for the explosion detonated the device.

*Id.* The memorandum contains no factual basis for its conclusion that "National Security personnel" leaked news about the U.S. convoy. To conclude that the memorandum's author "inferred" the conclusion "from the bomb's proximity to the checkpoint" is simply to speculate. Brown Op. at 6. The inference that personnel at the checkpoint knew about the bomb because of its proximity to the checkpoint, even if reasonable, says nothing about the further inference that personnel at the checkpoint leaked news of the U.S. convoy's arrival. The two inferences are unrelated. The former is supported by facts—the proximity of the bomb to the checkpoint—while the latter is not.

Because the Parsons family offers no admissible evidence to demonstrate that the PA intended or knew (or even recklessly disregarded whether) its conduct—assuming *arguendo* it provided material support or resources to whoever planted and detonated the bomb—would aid in the killing of a U.S. national, the PA is entitled to summary judgment on the Parsons family's section 2339A claim.

Judge Tatel would avoid section 2339A's scienter requirement by maintaining that the PA did not "identif[y] section 2339A's state of mind requirement as a problem for the *specific* theory" accepted by the majority—"namely, that the personnel posted at the checkpoint agreed to Qarmout's request not to interfere with his efforts to plant a bomb." Tatel Op. at 10-11 (emphasis in original); *see* Brown Op. at 8. To the

contrary, the PA repeatedly argues that the Parsons family failed to satisfy section 2339A's scienter requirement. *See* Appellees' Br. 33-34 (The Parsons family "offered no facts that could be presented in admissible form that *the PA* provided any kind of material support to the PRC, let alone that the PA provided such support 'knowing or intending' that it was 'to be used in preparation for, or in carrying out,' the killing of a U.S. national, as the statute requires." (emphasis in original) (quoting 18 U.S.C. § 2339A)); *id.* at 41-42 ("Even if someone in the PA had given Qarmout a weapon, there is no evidence that they did so 'knowing or intending that they are to be used' in carrying out the killing of a U.S. national or other terrorist act, as required by 18 U.S.C. § 2339A . . . ."); *id.* at 37 ("There is no evidence that Qarmout would have targeted a U.S. diplomatic convoy."); *id.* at 43 ("Plaintiffs . . . do not explain how a failure to adequately guard a security checkpoint and prevent the planting of an explosive charge meets the definition of 'material support' under the statute. *See* 18 U.S.C. § 2339A(b) (which requires an affirmative act of support engaged in *with the requisite knowledge and intent*, rather than an act of omission or negligence)." (emphasis added)). Nor is it "unfair to the Parsons family for us to consider whether the evidence creates a genuine dispute of material fact as to" a necessary element of their claims. *See* Tatel Op. at 11. The PA raised the lack of admissible evidence meeting section 2339A's scienter requirement both in its brief in this court and in its motion for summary judgment in district court. *See* Appellees' Br. 33-34, 37, 41-43; Mem. of Points & Auths. in Support of Defs.' Mot. for Summ. J. at 14, *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27 (D.D.C. 2010) (No. 07-cv-01847). The Parsons family thus has had ample opportunity to respond to the PA's argument. *See Skinner v. U.S. Dep't of Justice*, 584 F.3d 1093, 1101 (D.C. Cir. 2009) ("no unfairness" in affirming on alternative ground where issue was raised before district court with full opportunity to respond), *cert. denied*, 131 S. Ct. 72

(2010); *Washburn v. Lavoie*, 437 F.3d 84, 89 (D.C. Cir. 2006); *see also Wash.-Baltimore Newspaper Guild, Local 35 v. Wash. Post*, 959 F.2d 288, 292 n.3 (D.C. Cir. 1992) ("We have discretion to *uphold* a grant of summary judgment under a legal theory different from that applied by the district court, resting the affirmance on any ground that finds support in the record, particularly one raised before the district court." (emphasis in original)). Judge Tatel unrealistically parses the PA's defense into discrete and seemingly unrelated arguments.[6] *See* Tatel Op. at 10-11; *cf.* Brown Op. at 1-2 n.1. "[S]ummary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (internal quotation marks omitted). The Parsons family failed to make a showing sufficient to establish an essential element of their claim—that the PA, assuming it provided material support, acted with knowledge or intent that its support would aid the killing of a U.S. national. The district court therefore properly granted summary judgment to the PA.

---

[6] Even under his compartmentalized approach, moreover, Judge Tatel concedes that the PA raised section 2339A's scienter requirement as a defense to the Parsons family's "Qarmout theory." Tatel Op. at 11. He nonetheless contends that the PA's claim that "[t]here is no evidence that Qarmout would have targeted a U.S. diplomatic convoy," Appellees' Br. 37—which claim immediately follows the PA's explanation that Qarmout was known to attack Israeli military targets—"deals with whether Qarmout committed this attack, not with the state of mind of the personnel at the checkpoint." Tatel Op. at 11. If, however, the personnel at the checkpoint did not believe—because there was no evidence to support the belief—that Qarmout would target a U.S. convoy, any support they may have provided Qarmout would not have been given knowing or intending (or recklessly disregarding whether) it would be used to kill a U.S. national.

The PA is likewise entitled to summary judgment on the Parsons family's section 2332(b) conspiracy claim. Section 2332(b) makes it a crime to "attempt[] to kill, or engage[] in a conspiracy to kill, a national of the United States" outside the United States. 18 U.S.C. § 2332(b). "To prove a conspiracy charge, the [evidence] must show that the defendant agreed to engage in criminal activity and 'knowingly participated in the conspiracy' with the intent to commit the offense . . . ." *United States v. Hemphill*, 514 F.3d 1350, 1362 (D.C. Cir.) (quoting *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996)), *cert. denied*, 129 S. Ct. 590 (2008); *see also In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (to establish existence of criminal conspiracy under section 2332(b), evidence "must prove that the conspirators agreed on the essence of the underlying illegal objective[s], and the kind of criminal conduct . . . in fact contemplated." (ellipsis and alteration in original; internal quotation marks omitted)), *cert. denied*, 129 S. Ct. 2778 (2009), 130 S. Ct. 1050 (2010). Section 2332(b) thus requires that a violator knowingly conspire to kill a U.S. national. As explained earlier, the Parsons family has failed to show that the PA possessed the requisite knowledge or intent to support the conspiracy claim.

For the foregoing reasons, I would affirm *in toto* the district court's grant of summary judgment in favor of the PA and, accordingly, dissent from the reversal of summary judgment on the 18 U.S.C. § 2339A claim.

TATEL, *Circuit Judge*, concurring: I write separately to explain my reasons for joining our affirmance of the district court's grant of summary judgment to the Palestinian Authority as to the Parsons family's conspiracy claim. I also explain why I would decide neither the scienter issue my colleagues debate, *compare* Opinion of Judge Henderson ("Henderson Op."), *with* Opinion of Judge Brown at 1–8 ("Brown Op."), nor the vicarious liability issue that Judge Brown reaches, *see* Brown Op. at 17–21.

## I.

Although the parties appear to disagree about the exact elements of an Anti-Terrorism Act civil conspiracy claim, they agree, as do I, that the Parsons family must prove at least the existence of an agreement between Palestinian Authority employees and whoever planted the bomb. *Compare In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 114 (2d Cir. 2008) (listing among section 2332(b)'s requirements that a defendant ". . . *agree*[] *to* the essence of [the conspiracy's] objectives" (emphasis added)), *with United States v. Hemphill*, 514 F.3d 1350, 1362 (D.C. Cir. 2008) ("To prove a conspiracy charge, the [evidence] must show that the defendant *agreed to* engage in criminal activity . . . ." (emphasis added)). The family offers two evidentiary theories in support of its argument that a reasonable juror could find such an agreement.

Before addressing those theories, however, I briefly consider the family's argument that we should take account of two pieces of evidence the district court disregarded. First, the district court ruled inadmissible a document from the website archive of the Israeli Intelligence and Terrorism Information Center purporting to summarize a "captured" Palestinian Authority document allegedly describing plans to create a nitric acid factory to support bomb production. According to the district court, this document is inadmissible because

"[i]ntelligence reports that contain multiple levels of hearsay are not admissible evidence." *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 34 (D.D.C. 2010). Given that the document only summarizes the supposedly captured Palestinian Authority document and neither quotes that document nor attaches a copy of it, I see no abuse of discretion in the district court's decision. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1999) (explaining that "[o]n a motion for summary judgment . . . the question of admissibility of expert testimony . . . is reviewable under the abuse-of-discretion standard"). Accordingly, I too shall disregard the document.

The family also relies on a video snippet of a 2007 interview purportedly with Muhammad Dahlan, head of the Palestinian Preventive Security Services from 1999 until 2002 and Palestinian Minister of State Security from April until September 2003, in which Dahlan said (according to a translation on the Palestinian Media Watch website): "Forty percent of the Martyrs in this Intifada belonged to the Palestinian security forces. The Palestinian security forces were those who protected and hid half of the Hamas [military] leadership and of the Hamas military force during the Intifada." Palestinian Media Watch, http://www.palwatch.org/main.aspx?fi=713&fld_id=713&doc_id=864 (last visited July 22, 2011). The Palestinian Authority describes this video as "unauthenticated," suggesting that the video would be inadmissible at trial. Appellees' Br. 34. But to defeat summary judgment, a party need only produce evidence "capable of being converted into admissible evidence," *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks omitted), and the defect the Authority identifies seems hardly irremediable. Accordingly, and because the Authority offers no other inadmissibility argument in this court, I shall consider the Dahlan video.

I turn, then, to the family's two principal arguments for preserving their conspiracy claim, both of which rely almost exclusively on the undated and anonymous two-page memo discovered in the Palestinian Authority's investigative file. Pointing to a single sentence in that memo, the family first says they can prove that personnel at the checkpoint or Palestinian Authority officials in the convoy's lead car tipped off the terrorist about the convoy's movements. That sentence states: "[A]fter information of the arrival of US embassy staff was leaked, either by the National Security personnel at the checkpoint or by those who were accompanying the convoy, the person responsible for the explosion detonated the device." Because this sentence "is stated as a fact," not as an inference or a guess, the family argues that it must be believed. Appellants' Reply Br. 6 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), for the proposition that "the evidence of the non-movant is to be believed."). Moreover, the family contends that as the non-moving party they are entitled to a series of supportive inferences: that the memo was written by a qualified and high-ranking Palestinian Authority investigator, that it was prepared at the conclusion of the investigation, and that it was based on damning facts uncovered during that investigation.

Notwithstanding the family's valiant effort to build an entire case out of this single sentence, I think it too slender a reed to support the weight of the conspiracy claim. Applying *Liberty Lobby*, I focus on both the "quantity" and the "caliber" of the family's evidence. 477 U.S. at 254. Other than the single sentence from the memo, the only even potentially admissible evidence on which the family relies is (1) the entirely speculative suggestion that because Palestinian Authority officials were in the convoy and at the checkpoint they would have had the requisite opportunity to leak; and (2) the equally speculative suggestion that because

the former head of the Palestinian Security forces bragged that some among the many thousands of Palestinian Security forces participated in the Second Intifada, those *particular* forces at this *particular* checkpoint must have as well. As for the sentence from the memo, it too is of extremely poor "caliber." *Id.* In particular, the sentence refers to no specific facts on which the memo's author based his conclusion. By contrast, the sentence about the bomb resembling those used in the past by the Popular Resistance Committees rests on "[t]he lid of the device, the type of detonator, the cable used, the poorly connected batteries, the type of explosive material, [and] the outer casing of the device." Moreover, the Parsons family can show neither who wrote this memo nor at what stage in the investigation it was written. Accepting their tipster theory, therefore, would require piling inference (about the reliability and knowledgability of the statement's author) upon inference (about when the statement was written) upon inference (about the statement's evidentiary basis)—akin more to speculation than to reasonable fact-finding. And "[t]he possibility that a jury might speculate in the plaintiff's favor . . . is simply" insufficient to defeat summary judgment. *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010) (ellipsis in original) (internal quotation marks omitted). Nor does considering the memo in light of Dahlan's statement change this analysis, for that statement is cast at such a high level of generality that it makes the family's theory about what happened in this particular instance only infinitesimally more likely. *But see* Brown Op. 16–17. Accordingly, the family's tipster theory cannot save their conspiracy claim.

The Parsons family offers a second theory to support their conspiracy claim, namely, that the checkpoint security forces helped the terrorist while he planted the bomb. Significantly, however, the family never defends their

conspiracy claim by arguing, as they do with respect to their material support claim, that Qarmout planted the bomb with the help of those stationed at the checkpoint. Instead, the family advances only the more generic evidentiary theory that *someone* at *sometime* planted the bomb with *some* kind of assistance from those security forces. In support, the family relies principally on the fact that the checkpoint was only 20 meters from the bomb site, which to them means that personnel posted there must have known about the bomb. Seeking to demonstrate the reasonableness of that inference, the family points to another sentence in the memo which, employing identical reasoning, states, "The explosive device was planted 20 meters away from the National Security checkpoint, a fact that indicates that those present in front of the checkpoint that day have previous knowledge of the presence of the device." But apparently recognizing that simply knowing about a bomb or even failing to stop a bomb from being planted does not make one a co-conspirator in a terrorist attack, the family would have a jury further infer that the security forces affirmatively helped place the bomb, perhaps by complying with a request to look the other way. Defending that second inferential leap, the family relies on Qarmout's statements, but only for the limited proposition "that anyone that planted the bomb on [Salahadeen] Street . . . must have obtained the cooperation of the [Palestinian Authority] security checkpoint." Appellants' Br. 33. In addition, the family once again suggests that a juror could justifiably infer from Dahlan's boast that some Palestinian Security forces participated in some attacks during the Second Intifada that personnel at *this* checkpoint were complicit in *this* attack.

This second theory is just as dependent on incredibly little and incredibly low quality evidence—and so just as speculative—as the first. Not only would the family ask a jury

to make two quite substantial inferences—that the security forces knew of the bomb and that they affirmatively helped plant it—but, as the Palestinian Authority points out, they would do so based on evidence that leaves a number of important questions unanswered, such as "whether the checkpoint was manned 24-hours a day" and "whether the bomb could have been planted unseen at night." Appellees' Br. 44. Such a tower of inferences built atop a gap-filled foundation is too unstable to stand. I thus agree with the district court that the family's generic theory about the help personnel posted at the checkpoint must have provided in planting the bomb is also inadequate to defeat summary judgment.

Given that the Parsons family has failed to defend their conspiracy claim with any evidentiary theory other than the two just rejected, I would ordinarily end my analysis here. But because we have already explained in the context of the family's material support claim that a reasonable juror could find that "at a terrorist's behest" the Palestinian Authority personnel posted at the checkpoint "*agreed to* and did affirmatively remove the threat that local law enforcement officers would themselves interfere with the terrorist's efforts to plant a bomb," Maj. Op. at 14 (emphasis added), one might wonder (as does Judge Brown, *see* Brown Op. at 1, 8–17) how the family could have failed to show a genuine dispute of material fact as to the existence of an agreement in the context of their *conspiracy* claim.

Although there is some tension between these two analyses, responsibility for that tension belongs to the Parsons family alone. In the district court, the family defended their conspiracy claim first and foremost on the theory that the Palestinian Authority "through their security personnel conspired with a known member of the PRC [i.e., Qarmout]

to commit the terrorist act of planting [the] bomb" that killed Parsons. Parsons' Mem. in Opp'n to Def.'s Mot. for Summ. J. 16, Mar. 1, 2010, ECF No. 31. The district court, however, found the family's evidence insufficient to sustain that theory, but held that only material support claims, not conspiracy claims, require identifying who carried out the attack. Apparently prompted by that decision, the Parsons family decided to pursue their Qarmout theory on appeal only as an alternative argument in case we agreed with the district court that proving the bomber's identity is statutorily required—and thus only for their material support claim. Having made such a choice, the family must accept its consequences. *See Doe by Fein v. District of Columbia*, 93 F.3d 861, 875 n.14 (D.C. Cir. 1996) (per curiam) (finding forfeited an argument relied on by the district court but not raised on appeal).

According to Judge Brown, however, the family "properly [put Qarmout's statement] before the court as to the conspiracy claim, not just the material support claim." Brown Op. at 13. I disagree. The conspiracy section of the family's brief mentions the Qarmout evidence only in a single sentence, while devoting three full pages to the two-page memo discovered in the Palestinian Authority's investigative file. Appellant's Br. 33–36. By contrast, the family spends six pages of the material support section on the Qarmout and Popular Resistance Committee evidence. *Id.* at 22–24, 26–29. Moreover, in the conspiracy section, the family refers to the Qarmout evidence only in support of "the . . . generic evidentiary theory that *someone* at *sometime* planted the bomb with *some* kind of assistance from th[e] security forces," *supra* at 5; the family never suggests that evidence describes the specific conspiracy that is the basis for liability. Given the family's approach, it is hardly surprising that the Authority never once mentions the Qarmout evidence in responding to the family's conspiracy claim arguments—not even to

incorporate arguments made earlier with respect to the material support claim. Appellees' Br. 45–50. Indeed, the Authority expressly states its understanding that the evidence on which the family relies to support the conspiracy claim "consists of *only* the two-page memo." *Id.* at 46 (emphasis added). Of course, appellees sometimes miss appellants' arguments, but when they do we can usually count on appellants to point that out in their reply brief—something the Parsons family never does. So, far from misconstruing the family's brief—and far from "ignor[ing]" any evidence, Brown Op. at 8—my approach to the family's conspiracy claim simply abides by the basic "premise of our adversarial system . . . that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

Judge Brown insists that "[o]ur forfeiture doctrine applies to legal arguments, not facts." Brown Op. at 9. Not true. There is no such categorical distinction and Judge Brown has not identified even a single *forfeiture* case saying otherwise. Brown Op. 10. To the contrary, our district courts' Local Civil Rule 7(h) expressly authorizes courts to treat as forfeited evidence—including record evidence—that the parties fail to highlight at summary judgment. D.D.C. Local Civ. R. 7(h)(1) ("[T]he court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion," which statement "shall include references to the parts of the record relied on to support the statement."). The existence of a genuine dispute of material fact, therefore, ordinarily turns not on a review of the entire record, but rather on the "facts" and the portions of the record each party specifically highlights. *See Jackson v.*

*Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996) (rejecting the argument that "the court could not properly decide summary judgment without considering the entire record to determine the existence of genuine issues of material fact" (internal quotation marks omitted)). Likewise, we routinely refuse to consider evidence relied on for the first time on appeal even if that evidence was in the record before the district court. *See, e.g.*, *Potter v. District of Columbia*, 558 F.3d 542, 549–51 (D.C. Cir. 2009) (applying to record evidence the "well settled" forfeiture principle "that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal" (internal quotation marks omitted)).

We apply forfeiture to unarticulated evidentiary theories not only because "judges are not like pigs, hunting for truffles buried in briefs or the record," *Id.* at 553 (Williams, J., concurring) (internal quotations marks omitted); *accord* Brown Op. at 11, but also because such a rule ensures fairness to both parties. To deny a summary judgment motion based on an evidentiary theory the nonmoving party never developed would necessarily deprive the moving party of the opportunity to poke holes in that theory. *See Gardels v. CIA*, 637 F.2d 770, 773–74 (D.C. Cir. 1980) (explaining that one of the purposes of Local Civil Rule 7(h)'s predecessor was to "direct[] . . . the opponent . . . to the parts of the record" at issue so that "opponent . . . has the opportunity to respond"). This concern for fairness would be ill-served if we regularly decided appeals based on record evidence only passingly mentioned in a footnote, or identified for the first time in a reply brief or at oral argument. *But see* Brown Op. at 9, 11 (implying we do just that).

Fairness is implicated as well where, as here, the nonmoving party develops an adequate evidentiary theory in

defense of one but not another claim—at least where the two claims have different elements. After all, an argument useless for attacking a theory in the context of one claim may be devastating to that same theory in the context of the other claim. It is hardly surprising then that in *Vickers v. Powell*, we did exactly what I do here—namely, in reviewing a district court's summary judgment decision, we expressly declined to consider relevant record evidence with respect to one of the nonmovant's claims because the nonmovant had relied on that evidence only to defend a different claim. 493 F.3d 186, 196 (D.C. Cir. 2007) (declining to consider evidence of "various discriminatory acts" to rebut an employer's allegedly non-discriminatory explanation for firing nonmovant in the context of nonmovant's retaliation claim even while evaluating that evidence in the context of nonmovant's hostile work environment claim because nonmovant only advanced that evidence in support of the latter claim).

## II.

My colleagues debate whether "the Parsons family has failed to establish the scienter requirement of" their two claims. Henderson Op. at 1. *Compare id.* (genuine dispute of material fact *not* shown for the scienter element), *with* Brown Op. at 1–8 (disagreeing). I have no need to reach this issue with respect to the Parsons family's conspiracy claim because, for the different reasons discussed above, I would affirm the grant of summary judgment as to that claim. I would also decline to address the issue as to the family's material support claim because in its brief to this court the Palestinian Authority never identifies section 2339A's state of mind requirement as a problem for the *specific* theory we now accept, namely, that the personnel posted at the checkpoint agreed to Qarmout's request not to interfere with his efforts to plant a bomb. *See United States v. Reeves*, 586 F.3d 20, 26

(D.C. Cir. 2009) (arguments not made on appeal are ordinarily forfeited).

According to Judge Henderson, the Authority did raise this argument—indeed, "repeatedly." Henderson Op. at 9. But two of these "repeated[]" references appear in sections of the Authority's brief devoted to evidentiary theories other than the Qarmout theory. *See* Appellees' Br. 33–34 (PRC theory); *id.* at 43 (the so-called proximity theory). Nor are Judge Henderson's two citations to the Authority's Qarmout-based section any more on point. The first—"[t]here is no evidence that Qarmout would have targeted a U.S. diplomatic convoy," Appellee's Br. 37—deals with whether Qarmout committed this attack, not with the state of mind of the personnel at the checkpoint. The second—"[e]ven if someone in the [Palestinian Authority] had given Qarmout a weapon, there is no evidence that they did so 'knowing or intending that they are to be used' in carrying out the killing of a U.S. national or other terrorist act . . . ," Appellees' Br. 41–42 (quoting 18 U.S.C. § 2339A(a))—clearly refers only to the theory that the Authority provided Qarmout with weapons, rather than the theory that the personnel posted at the checkpoint agreed to Qarmout's request not to interfere with his efforts to plant a bomb. Because these references point to evidentiary theories other than the Qarmout theory or to elements of the Qarmout theory other than the state of mind element, they are hardly adequate to put the Parsons family on notice of the specific element of the specific evidentiary theory that Judge Henderson now addresses. Under these circumstances, then, it would be unfair to the Parsons family for us to consider whether the evidence creates a genuine dispute of material fact as to the security forces' state of mind when allegedly aiding Qarmout.

Moreover, even if the Authority had properly raised the scienter issue, I would exercise our discretion not to reach it. The district court never decided this issue and on appeal the parties address it, at best, in passing, and at worst, not at all, *see supra* at 10–11. As my colleagues' debate well demonstrates, the issue is both novel and complex. Under these circumstances, I think it most "prudent to remand the . . . issue[] to the district court for an initial evaluation." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 783 F.2d 237, 251 (D.C. Cir. 1986) (noting that federal appellate courts have discretion to remand "purely legal" issues unaddressed by the district court and inadequately briefed on appeal).

Judge Brown also addresses the Authority's contention that it may not be held vicariously liable under the Anti-Terrorism Act for the acts its checkpoint employees allegedly took to aid Qarmout. Brown Op. at 17–21. Again, I have no need to reach this issue as to the family's conspiracy claim. *See supra* at 1–10. As for the material support claim, although the Authority raised its vicarious liability theory against that claim at oral argument, it never did so in its brief—an oversight I would not overlook. Recording of Oral Arg. at 15:08–15:25, 16:43–17:55; *see also Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003) (arguments raised for the first time at oral argument are forfeited). Accordingly, I decline to address the vicarious liability issue.

## III.

I agree with Judge Brown about the virtue of our "narrow holding": "we have at least avoided making bad law." Brown Op. 21. As the thoughtful legal analyses of my colleagues reveal, the Anti-Terrorism Act's civil liability provision raises many difficult and still unresolved questions. What scienter

showing does the Act require? What is the scope of vicarious liability? Does the intent requirement apply to every element of the Act? That the parties, in addition to outright forfeiting several arguments, barely, or at best poorly, address these other questions confirms my judgment to cut a narrow path in deciding this appeal.

BROWN, *Circuit Judge*, concurring in part and dissenting in part: I concur in reversing the district court's grant of summary judgment in favor of the Palestinian Authority ("PA") on the Parsons family's material support claim under 18 U.S.C. § 2339A. I dissent from the court's affirmance of summary judgment on the family's conspiracy claim under § 2332(b). For three reasons, each of which is necessary to my conclusion, I would reverse summary judgment on that claim too. First, I respectfully disagree with Judge Henderson's conclusion that the Parsons family's evidence is insufficient to prove the PA "knowingly" provided material support to, and conspired with, the terrorist who killed Mark Parsons. Second, I respectfully disagree with Judge Tatel that the Parsons family forfeited, as to its conspiracy claim, facts we agree the family properly asserted about alleged bomber Amer Qarmout in the material support context; and that the evidence is insufficient to prove conspiracy. Finally, the district court erred in concluding the Palestinian Authority may not be held vicariously liable under the Anti-Terrorism Act for the acts of its agents.

I

Judge Henderson would affirm the district court's grant of summary judgment in favor of the Palestinian Authority as to both claims, because she thinks the Parsons family has not satisfied the relevant *scienter* requirements for civil liability under 18 U.S.C. §§ 2339A(a) and 2332(b). Like Judge Tatel, I disagree with Judge Henderson, but we disagree for different reasons. Judge Tatel relies on forfeiture, Tatel Op. at 10–11, and I would reach the merits.[1] The Parsons family

---

[1] Consistent with Judge Tatel's compartmentalized approach to the evidence, which I address below, *see infra* pp. 8–15, he deals with Judge Henderson's *scienter* argument by finding the Palestinian Authority "never identifies section 2339A's state of mind requirement as a problem

satisfies the relevant *scienter* requirements as to both their material support claim and their conspiracy claim.

A

The Anti-Terrorism Act provides a civil remedy for U.S. nationals injured by an act of international terrorism. 18 U.S.C. § 2333(a). "[I]nternational terrorism" is defined to mean extraterritorial or transnational activities that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State . . . [and] appear to be intended" to achieve the coercive ends of terrorism. *Id.* § 2331(1). The Parsons family alleges the Palestinian Authority committed the predicate criminal offense of "provid[ing] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out a violation of section . . . 2332," *id.* § 2339A(a), which in turn sanctions "[w]hoever kills a national of the United States, while such national is outside the United States," *id.* § 2332(a).

---

for the *specific* theory we now accept, namely, that the personnel posted at the checkpoint agreed to Qarmout's request not to interfere with his efforts to plant a bomb." Tatel Op. at 10–11. But the PA's argument is the same for every theory—namely, that the guards did not know they were materially supporting the killing of an American as opposed to, say, an Israeli. I think it is sufficient for a party to raise a statutory *scienter* defense once for the whole claim to which it applies. It is not necessary to rehearse the same statutory argument for each specific theory of liability. Precise arguments certainly benefit the judicial process, but we are judges, not robots. *Cf.* Henderson Op. at 10 ("Judge Tatel unrealistically parses the PA's defense into discrete and seemingly unrelated arguments."). Moreover, the Parsons family conceded that liability under the material support statute requires *scienter* as to the nationality of the victim, Oral Arg. 9:50–10:06, so they cannot argue they were unfairly prejudiced by the form of the Palestinian Authority's arguments.

Because the Parsons family conceded as much, *see* Oral Arg. 9:50–10:06, I assume the intent requirement of § 2339A(a) applies to each element of § 2332(a), even though the latter section contains no intent requirement of its own. *Cf. Flores-Figueroa v. United States*, 129 S. Ct. 1886, 1888–89 (2009) (holding the scienter requirement in the phrase "knowingly transfers . . . without lawful authority, a means of identification of another person" applies to all elements of the clause, including "of another person"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 79 (1994) (Stevens, J., concurring) (same for elements in different subsections of a single statutory section). In other words, to prevail on its material support claim, the Parsons family must demonstrate the Palestinian Authority "kn[ew] or intend[ed]" its material support to assist not just any killing, but the killing of a U.S. national. Thus, the first interpretive challenge is resolved by agreement of the parties.

But the *scienter* requirement for material support entails another interpretive problem: Section 2339A is a *criminal* statute, but it is a predicate for *civil* liability under § 2333(a). In the context of civil liability, we judge a violation of § 2339A differently than we would if this were a criminal matter. For example, the Parsons family need not prove its case beyond a reasonable doubt, but only by a preponderance of the evidence. Likewise, the civil intent requirements apply, not their criminal counterparts.

Viewed through the lens of civil liability, the "knowing or intending" requirement of § 2339A is satisfied by criminal recklessness, a deliberate indifference to the attendant risk—here, the risk that the material support would be used to kill an American. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 693–94 (7th Cir. 2008) (en banc). Judge Henderson cites the dissent in *Boim* to suggest there is

disagreement about the *scienter* requirement. Henderson Op. at 3. But even the dissenters in *Boim* agree with the criminal recklessness standard in theory. *See id.* at 721 (Wood, J., concurring in part and dissenting in part). They disagree over the application of this standard to the facts, and this is where I disagree with Judge Henderson. The Parsons family's case is even stronger than the case in *Boim* where a majority of the Seventh Circuit concluded a mere monetary donation to Hamas satisfied the criminal recklessness standard. Here, by contrast, the Parsons family alleges National Security personnel materially supported the planting of a specific bomb and its detonation under a specific American convoy.

Deliberate indifference about the risk to Americans may be reasonably inferred from the interaction of four main pieces of evidence: Qarmout's statement that he solicited the cooperation of National Security personnel at the checkpoint where he may or may not have actually planted the bomb, the proximity of the bomb to that checkpoint, the presence of a Palestinian Authority car at the head of the American convoy, and the PA's own investigative report, which concludes National Security personnel tipped off the bomber about the approaching American convoy. Viewed together, this evidence is sufficient for a reasonable juror to conclude the Palestinian Authority's agents at least knew of the risk that Americans would be targeted and disregarded that risk.

Judge Henderson points out that the unsigned PA report requires a jury to infer something about the "reliability and knowledgability of the statement's author," Henderson Op. at 5, but I think the origin, form, and substance of the report reasonably support such an inference. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) ("[T]he court must draw all reasonable inferences in favor of the nonmoving party."). The Palestinian Authority itself produced the report in

discovery. It is addressed to the Director General of the PA's Preventive Security Service ("PSS"), and purports to be based on firsthand examination of the evidence. Through ███ ███████████████, the PA later confirmed it had disclosed an "investigative file" documenting its investigation, which "involved the forensic analysis of material evidence gathered at the scene of the bombing." Sealed Appendix ("S.A.") 259. The PA "verif[ied] that the records produced are authentic copies of records kept in the course of the investigation into the bombing." *Id.*

An official government record such as this is entitled to a presumption of regularity, rebuttable only upon a showing of "clear or specific evidence." *PNC Fin. Servs. Group v. Comm'r*, 503 F.3d 119, 123 (D.C. Cir. 2007) (quoting *Riggs Nat'l Corp. v. Comm'r*, 295 F.3d 16, 21 (D.C. Cir. 2002) (affording the presumption of regularity to a foreign tax receipt)). Since "the early days of the Republic," the presumption of regularity "has been applied in a variety of contexts." *Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727 & n.33 (D.C. Cir. 1989) (collecting cases). It governs not only records that "memorialize the occurrence of a specific event," Henderson Op. at 6, but also posits that government officials follow proper procedures in the conclusions, inferences, and subjective judgments they reach in the regular course of their official duties. *See, e.g.*, *Musengo v. White*, 286 F.3d 535, 538 (D.C. Cir. 2002) (an Officer Evaluation Report used "to evaluate an [Army] officer's performance and career potential"); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 994 (D.C. Cir. 1984) (a judge's adoption of findings and conclusions from a party's filing); *McSurely v. McClellan*, 697 F.2d 309, 324 (D.C. Cir. 1982) (a warrant issued pursuant to "the judge's independent opinion that there is probable cause for an arrest or a search"); *Jones v. United States*, 342

F.2d 863, 884 (D.C. Cir. 1964) ("the findings of a grand jury"). Of course, this presumption would not require a jury to accept the author's inference that National Security personnel knew about the bomb and tipped off the bomber. But it does mean that, absent "clear or specific evidence," the report should be presumed to be an "authentic copy" of "materials prepared by [one of the PA Preventive Security] [S]ervices investigating the bombing," as the PA implied it was. S.A. 258, 259.

Judge Henderson assumes, in favor of the *moving* party, that the report's author was a rogue investigator who reached unfounded conclusions despite unparalleled access to the evidence. *See* Henderson Op. at 5–8. *Contra Talavera*, 638 F.3d at 308 ("The evidence is to be viewed in the light most favorable to the *nonmoving* party." (emphasis added)). There is no basis for this assumption. Although the Palestinian Authority is in the best position to do so, it has offered no evidence, much less "clear or specific" evidence, that the report's author was unqualified to reach the conclusions he did, or that he lacked an evidentiary basis for those conclusions.[2]

The report's author inferred from the bomb's proximity to the checkpoint that National Security personnel "ha[d] previous knowledge of the presence of the device." S.A. 305. Based on "the information in [his] possession," the report's author also concluded that the checkpoint personnel or the other National Security personnel accompanying the convoy "leaked" "information of the arrival of US Embassy staff" to the bomber. *Id.* A jury could reasonably infer that this

---

[2] Judge Henderson notes the ▮▮ Declaration does not explicitly discuss the PA report as it does Qarmout's statement. Henderson Op. at 6 n.5. But ▮▮ failure to single out the report from the rest of the PA's investigative file is hardly evidence that it is unreliable.

conclusion too was based on the bomb's proximity to the checkpoint—a detail that the report's conclusion mentions twice. *Id.* That the evidentiary basis for this conclusion is only implicit in the report does not void the presumption of regularity. *See Am. Fed'n of Gov't Emps.*, 870 F.2d at 724, 727. We are in no position to say the report's inferences are unreasonable, coming as they do from the PA's own ranks after an investigation that only the PA could have conducted. Presumably security guards are responsible for being aware of their surroundings, *see* Maj. Op. at 14, and there is something suspicious about the timing of an attack that blows up U.S. vehicles but misses the PA's lead car. Former Palestinian Security Minister Muhammad Dahlan's statement on Al-Arabiya TV that Palestinian security forces aided Hamas and martyred themselves during the Second Intifada tends to support that conclusion. *See infra* pp. 16–17.[3]

This evidence may not be overwhelming, but at the summary judgment stage it need only be sufficient. A jury could reasonably be persuaded by the same evidence that convinced the Palestinian Authority's own investigator—someone who presumably had access to the scene of the bombing and knowledge of the environment. If the report is correct, the checkpoint personnel acted with more than deliberate indifference; they knowingly assisted in the bombing of an American convoy.

---

[3] Contrary to Judge Henderson's implication, *cf.* Henderson Op. at 5 n.3, the record contains not just an English translation, but the video clip of Dahlan's statement itself, complete with Arabic audio. *See* Palestinian Media Watch, *PA Security Forces Aided Hamas During Intifada*, PMW, http://www.palwatch.org/main.aspx?fi=713&fld_id=713&doc_id=864 (last visited July 22, 2011). Presumably the video and its translation could be authenticated at trial. *See* Tatel Op. at 2.

B

The same evidence that proves material support is sufficient to prove the existence of a civil conspiracy. Qarmout's statement that he asked the National Security personnel at the checkpoint to "turn their attention from the young men who were planting the device" days before the explosion, S.A. 323, supports a reasonable inference of "an agreement to take part in an unlawful action." *Hall v. Clinton*, 285 F.3d 74, 83 (D.C. Cir. 2002) (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)). The circumstances of the bombing and the PA report's conclusion that National Security personnel tipped off the bomber support a reasonable inference of "an overt tortious act in furtherance of the agreement that causes injury." *Id.* (emphasis omitted) (quoting Halberstam, 705 F.2d at 479). Therefore, I would reverse the district court's grant of summary judgment on both claims.

II

Judge Tatel, who casts the deciding vote on each of the Parsons family's claims, splits the baby by separating with almost surgical precision the evidence advanced in this court for the various theories supporting each claim. The court affirms summary judgment on the conspiracy claim because Judge Tatel ignores the very same evidence we use to reverse summary judgment on the material support claim— Qarmout's statement that, soon before Mark Parsons was killed on Salahadeen Street, Qarmout took steps to plant a bomb there and asked the National Security personnel at the checkpoint to "turn their attention from the young men who were planting the device." S.A. 323. According to Judge Tatel, we can overlook the most probative evidence of conspiracy because (1) a party forfeits facts as to any theory

for which they are not explicitly argued on appeal, and (2) "the family never defends their conspiracy claim by arguing, as they do with respect to their material support claim, that Qarmout planted the bomb with the help of those stationed at the checkpoint." Tatel Op. at 5. I respectfully disagree with both premises.

A

Forfeiture is the "failure to make a timely assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993). Our forfeiture doctrine applies to legal arguments, not facts. Assuming an argument has been properly raised in the district court, we consider it forfeited on appeal if the argument is addressed in a conclusory fashion, *see Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008), or only in a footnote, *see NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007); or if it is raised for the first time in a reply brief, *see Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 123 (D.C. Cir. 2010), or at oral argument, *see United States v. Southerland*, 486 F.3d 1355, 1360 (D.C. Cir. 2007). No similar rule bars our consideration of a material fact once it has been placed in dispute. *Cf. Republic of Iraq v. Beaty*, 129 S. Ct. 2183, 2192 (2009) (assuming the correctness of the proposition that "the President cannot waive a fact").[4] And we have never held that we are powerless to consider a fact simply because it was raised in the context of a different claim. The concept of claim-specific forfeiture is foreign to facts because facts, unlike legal arguments, are not context-dependent. A fact cannot be true for some purposes and false for others. What

---

[4] That facts and law are cut from different cloth is evident in the general rule that parties may stipulate facts but not legal conclusions. *See Weston v. Washington Metro. Area Transit Auth.*, 78 F.3d 682, 685 (D.C. Cir. 1996). Likewise, on appeal parties may forfeit legal arguments but not facts.

would we say to a jury that found Qarmout planted the bomb with regard to the material support claim but that he did not plant the bomb with regard to the conspiracy claim? *Cf. Hundley v. District of Columbia*, 494 F.3d 1097, 1102–03 (D.C. Cir. 2007) (ordering a new trial because "[t]here is no coherent or reasonable way to reconcile the jury's two conclusions"). Judge Tatel's treatment of the Parsons family's allegation is no more reasonable. Once a fact is in dispute, it is before the court for all relevant purposes; any claim as to which it is material is inappropriate for summary judgment.

As Judge Tatel notes, I have "not identified even a single *forfeiture* case saying" our forfeiture doctrine does not apply to facts. Tatel Op. at 8. But my failure to find precedent proving this negative only highlights the novelty of his argument. Far more telling is Judge Tatel's failure to identify a single case holding that facts properly raised as to one claim are forfeited as to another,[5] or—even more implausibly—that facts asserted as to one particular theory are forfeited as to another theory of recovery under the same claim. *Cf.* Tatel Op. at 7.

---

[5] Judge Tatel cites one case in which he says we treated factual assertions properly raised as to one claim as though forfeited for purposes of another claim. Tatel Op. at 10 (citing *Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007)). Not so. In that Title VII case, we noted the plaintiff "never argued that the various discriminatory acts alleged in her hostile work environment claim . . . were further evidence of pretext" in her retaliation claim. *Vickers*, 493 F.3d at 196. The relevant forfeiture was legal, not factual. Vickers never argued a legal theory under which *prior* acts, by employees other than the official who fired her, could prove pretext. We rightly declined to apply those properly asserted facts to a legal argument Vickers had never articulated. The present case is different: The Parsons family has consistently argued a legal theory (whoever planted the bomb needed the guards' complicity) into which the allegedly forfeited fact (Qarmout planted the bomb) fits neatly.

Granted, facts not in the record may not be relied upon in this court, *see Carr v. Corning*, 182 F.2d 14, 21 (D.C. Cir. 1950), and a party who admits or stipulates facts is bound by that concession on appeal, *see United States v. Warren*, 42 F.3d 647, 658 (D.C. Cir. 1994).[6] Even when the record contains relevant facts that have not been conceded away, "it is not the task of this court . . . to search the record for supporting evidence." *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 422 n.13 (D.C. Cir. 1991) (quoting *Tarpley v. Greene*, 684 F.2d 1, 7 n.17 (D.C. Cir. 1982)). But these evidentiary principles are distinct from the doctrine of forfeiture, and they do not prevent us from considering Qarmout's statement in the conspiracy context. The Parsons family has never conceded—for the purpose of its conspiracy claim or for any other purpose—that Qarmout did *not* plant the bomb. The district court clearly did not think so: In the very decision we are reviewing, the court evaluated Qarmout's statement *in the conspiracy context*. *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 34 (D.D.C. 2010). And on appeal, the family has consistently and conspicuously asserted facts about Qarmout that, if true, would prove their theory that whoever planted the bomb conspired with the Palestinian Authority.

Especially at the summary judgment stage, it makes little sense to speak of "forfeiting" facts as to one claim but not

---

[6] As Judge Tatel points out, facts alleged at summary judgment by the moving party are treated as "admitted" unless controverted by the non-moving party. Tatel Op. at 8 (citing D.D.C. Local Civ. R. 7(h)(1)). This only illustrates the principle that a party cannot rely on facts it has failed to timely assert, and that a party is bound by its admissions. But once controverted, a fact is controverted for all purposes. By the same token, a fact asserted for one purpose is asserted for all purposes. It either happened or it did not happen. The rule of constructive admission offers no support to Judge Tatel's notion that a fact asserted in the context of one legal theory is forfeited as to another unless restated in the new context.

another. For at this stage, the scope of our review is at its zenith. "In passing on a summary judgment motion, a court may consider materials specified in Federal Rule of Civil Procedure 56(c) as well as 'any material that would be admissible or usable at trial.'" *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 38 (D.C. Cir. 1987) (emphasis omitted) (quoting 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2721 (2d ed. 1983)); *see also Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) ("When considering whether summary judgment . . . is warranted . . . , the court considers all relevant evidence presented by the plaintiff and defendant."); *Vickers*, 493 F.3d at 199 ("On summary judgment, we consider not just [the plaintiff's] allegations but also other supporting evidence" in the record.); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079 (D.C. Cir. 1999) ("The court must consider all the evidence in its full context in deciding whether . . . summary judgment is inappropriate." (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998))). The Qarmout evidence is clearly "usable at trial" to prove conspiracy, not just material support. *Catrett*, 826 F.2d at 38. We need not ignore it simply because it was raised in support of a different claim. The same evidence proffered by the same plaintiffs against the same defendant would go to the same jury for both claims. It is for the jury to weigh that evidence in context.

## B

Even if we had to sever a plaintiff's claims from one another and examine in isolation the evidence proffered for each claim, I would still disagree with the suggested application of this new rule. At the critical point in the operation, the Solomonic scalpel slips. As Judge Tatel must acknowledge, the Parsons family *does* rely on Qarmout's statement, not only for the material support claim, but also for

the conspiracy claim. In the section of its brief addressing the conspiracy claim, the Parsons family cites the relevant evidence and argues, "[i]t is clear from known-PRC-terrorist Qarmout's statement that anyone that planted the bomb on [Salahadeen] Street that killed Mark Parsons must have obtained the cooperation of the PA security checkpoint on the road, which was 20 meters from the site of the detonated bomb that killed Mark Parsons." Appellants' Br. 33. Assuming the validity of Judge Tatel's compartmentalized approach to the evidence, Qarmout's statement is properly before the court as to the conspiracy claim, not just the material support claim.

Judge Tatel acknowledges this reference to Qarmout's statement but construes it narrowly as an argument that someone other than Qarmout himself conspired with the Palestinian Authority to plant, conceal, or detonate the bomb. Tatel Op. at 5. The court thus affirms summary judgment on the conspiracy claim for want of an explicit allegation that Qarmout conspired with the Palestinian Authority, despite the Parsons family's argument—based on Qarmout's own statement—that whoever planted the bomb would have needed the Palestinian Authority's cooperation. I do not see why, in the conspiracy context, we should ignore Qarmout's likely involvement, while finding the very same evidence sufficient to sustain a material support claim. Our task, at the summary judgment stage, is to view all evidence "in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 223 (D.C. Cir. 2011) (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008)). Excluding Qarmout from the Parsons family's reference to "anyone that planted the bomb on [Salahadeen] Street" seems inconsistent with

that rule, especially after the family has consistently argued Qarmout did just that and cited evidence to prove it.

C

Even if it were possible to forfeit facts, and even if the Parsons family had forfeited the Qarmout evidence as to their conspiracy claim, I would not ignore that evidence. We have discretion to address forfeited issues, though we exercise it "only in exceptional circumstances" or to correct plain error. *Salazar v. District of Columbia*, 602 F.3d 431, 437 (D.C. Cir. 2010). Where, as here, the district court addressed the supposedly forfeited fact in the relevant context, *see Estate of Parsons*, 715 F. Supp. 2d at 34, the forfeiting party raised the fact in a parallel context, *see* Appellants' Br. 22–29, and the adverse party suffered no prejudice from the forfeiture, I would exercise our discretion to consider the fact at summary judgment.

I disagree with Judge Tatel's conclusion that the Palestinian Authority suffered prejudice from the alleged forfeiture. The Parsons family made no secret of its evidence that Qarmout planted the bomb after procuring an agreement from National Security personnel, and the family clearly articulated a theory of conspiracy to match. Under these circumstances, the Palestinian Authority was on notice of the evidence it needed to rebut. Indeed, at oral argument the Palestinian Authority repeatedly, and on its own initiative, ventilated its arguments against the probative value of the Qarmout evidence *in the conspiracy context*. *See* Oral Arg. 14:06–20, 15:20–16:37. Where a party responds to an issue despite defects in its presentation, that party has suffered no prejudice and a court need not consider the argument forfeited. *See MBI Group, Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010); *Horizon Air*

*Indus., Inc. v. U.S. Dep't of Transp.*, 850 F.2d 775, 781 (D.C. Cir. 1988).

Given the nature of the Parsons family's allegations, evidence sufficient to prove their material support claim is also sufficient to prove conspiracy. Either way, the Parsons family alleges the Palestinian Authority agreed to cooperate with whoever planted the bomb. Where the prevailing theories of material support and conspiracy overlap as they do here, a defendant is unlikely to specially tailor a novel argument against the sufficiency of the evidence to prove conspiracy that he has not already raised in the material support context. The same counterargument that fails to defeat the material support claim necessarily fails in the conspiracy context. The overlapping character of the family's claims was not lost on the Palestinian Authority. As the PA expressed it, the Parsons family is "sort of cloaking what is a conspiracy theory in a material support theory." Oral Arg. 28:09–14. It is no wonder then that the Parsons family did not devote equal space to the Qarmout evidence in each section of its brief. *Cf.* Tatel Op. at 7. That would have been repetitive and wasteful.[7] Because the Palestinian Authority could and did respond to Qarmout's statement in the conspiracy context, I would not ignore that evidence.

---

[7] Judge Tatel faults the Parsons family's reply brief for not correcting the Palestinian Authority's misimpression that the PA report was the only evidence relevant to the conspiracy claim. Tatel Op. at 8. I agree the family could have been clearer, but its reply brief does demonstrate the PA's error by merging its treatment of material support and conspiracy into a single discussion about the sufficiency of the Qarmout evidence. Appellants' Reply Br. 9–12.

D

Finally, even if I were persuaded to ignore the Qarmout evidence, I would still vote to reverse the grant of summary judgment against the Parsons family's conspiracy claim. The conclusion of the Palestinian Authority's own investigative report and the video recording of Muhammad Dahlan, former Palestinian Minister of State Security, are sufficiently probative to get this question to a jury.

Judge Tatel concludes the PA report is of insufficient "caliber" to persuade a reasonable jury because it is anonymous, undated, and leaves unstated some of the facts on which it bases its inference of PA complicity. Tatel Op. at 4 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)). This conclusion neglects the investigative report's provenance, treating it as if it were a friendly declaration rather than the party-opponent admission it is. As I have already argued, *supra* pp. 5–6, the report is a government record entitled to a presumption of regularity. The Palestinian Authority argues there might be innocent explanations for the guards' failure to prevent the planting of a bomb twenty meters in front of their checkpoint: After all, the Gaza Strip is a chaotic place, and the bomb may have been planted under cover of darkness or when a guard was distracted. *See* Oral Arg. 22:20–43. But, as Judge Tatel said in oral argument, "That's a great jury argument." *Id.* 22:43–47. "[T]he weighing of the evidence[] and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 253.

Judge Tatel also finds insufficiently probative then-Security Minister Muhammad Dahlan's statement that

> Forty percent of the Martyrs in this Intifada belonged to the Palestinian security forces.

> The Palestinian security forces were those who protected and hid half of the Hamas [military] leadership and of the Hamas military force during the Intifada.

Palestinian Media Watch, *supra* note 3. Judge Tatel is right that Dahlan's statement, by itself, does not prove "personnel at *this* checkpoint were complicit in *this* attack." Tatel Op. at 5. But this additional evidence certainly lends credibility to the conclusions of the PA's investigative report. Treating each piece of evidence in isolation may lead to an erroneous view of the whole. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) ("Those who do not take into account conditional probability are prone to making mistakes in judging evidence. They may think that if a particular fact does not itself prove the ultimate proposition . . . the fact may be tossed aside and the next fact may be evaluated as if the first did not exist."), *cert. denied*, 131 S. Ct. 1001 (2011). Parsons was killed during the Second Intifada, and Dahlan's statement about the sympathy Palestinian Authority security forces harbored toward its goals may inform a reasonable jury's view about the reliability of other evidence. Viewed together with the PA report, Dahlan's statement increases the likelihood the Palestinian Authority conspired with whoever was responsible for the bombing. It is the jury's job to weigh this evidence. Not ours.

## III

The district court stated without explanation that "we have no basis on which to assign vicarious liability to the PA for the alleged criminal acts of a few employees." *Estate of Parsons*, 715 F. Supp. 2d at 34. We have never so held. *Cf. Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 & n.4 (D.C. Cir. 2003) (barring the Anti-Terrorism Act suit without reaching the defendant's vicarious liability argument). Judge

Henderson and Judge Tatel avoid deciding whether the Palestinian Authority can be held liable for the actions of its National Security checkpoint personnel by affirming summary judgment on the conspiracy claim on other grounds. I would reach this issue and reverse.

"[W]e start from the premise that when Congress creates a federal tort it adopts the background of general tort law." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1191 (2011). Consistent with this principle, the Supreme Court has looked to common law doctrines to determine the scope of liability under federal tort laws, *see Burlington N. & Santa Fe Ry. v. United States*, 129 S. Ct. 1870, 1881 (2009) ("Congress intended the scope of [CERCLA] liability to be determined from traditional and evolving principles of common law." (quotation mark and alteration omitted)), and of vicarious liability in particular, *see Burlington Indus. v. Ellerth*, 524 U.S. 742, 764 (1998) ("accommodat[ing] the agency principles of vicarious liability for harm caused by misuse of supervisory authority" in Title VII). The Foreign Sovereign Immunity Act confirms that to the extent it is not immune, a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. *Respondeat superior* liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the Anti-Terrorism Act. Thus, the Palestinian Authority is liable for the acts its employees committed within the scope of their employment. *See Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1301 (D.C. Cir. 1985).

The Palestinian Authority argues it cannot be held vicariously liable for its employees' acts because the ATA awards treble damages, which the Palestinian Authority equates with punitive damages; and punitive damages may

only be awarded under a vicarious liability theory if the principal authorized, ratified, or approved the act, or if the agent was employed in a managerial capacity and committed the act within the scope of his employment. Appellees' Br. 51 (citing *Kolstad v. ADA*, 527 U.S. 526, 542–43 (1999) (quoting Restatement (Second) of Agency § 217C (1958))).[8]

The Palestinian Authority's central premise is false. Treble damages are statutory or liquidated damages—not punitive damages. The Restatement, on which the *Kolstad* Court relied, explicitly exempts treble damages from the punitive damages exception to its vicarious liability rule. *See* Restatement (Second) § 217C, cmt. (c) ("The rule stated in this Section does not apply to the interpretation of special statutes such as those giving triple damages, as to which no statement is made.").

The Supreme Court's statement of the punitive damages exception to vicarious liability is entirely consistent on that score with the underlying opinion of this court, which explicitly distinguished treble damages from punitive damages. *Kolstad v. ADA*, 139 F.3d 958, 966–67 (D.C. Cir. 1998) (en banc), *vacated on other grounds*, 527 U.S. 526 (1999). In that opinion we classified "double or treble damages" with "numerically equal compensatory and liquidated damages" for a single violation and concluded "it is quite another [thing] to leverage a compensatory award into a punitive award that is ten or a hundred times greater, with no showing of heightened culpability." *Id.* at 967; *see also id.* at 966–67 ("liquidated damages under the ADEA and punitive damages under Title VII are not twins"). Although

---

[8] The Palestinian Authority does not mention that *Kolstad* and the Restatement also allow punitive damages against a principal who "acts recklessly in employing the malfeasing agent." *See Kolstad*, 527 U.S. at 543.

courts have characterized treble damages as "punitive" for other purposes,[9] our *Kolstad* opinion makes clear that for purposes of selecting the applicable standard for vicarious liability, treble damages are not punitive. Indeed, the Supreme Court had already held, in the antitrust context, that treble damages do *not* trigger the heightened standard for vicarious liability. *Am. Soc'y of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 575–76 (1982) ("Since treble damages serve as a means of deterring antitrust violations and of compensating victims, it is in accord with both the purposes of the antitrust laws and principles of agency law to hold [the principal] liable for the acts of agents committed with apparent authority." (citing Restatement (Second) of Agency § 217C, cmt. (c)). I see no basis for a terrorism exception to the Supreme Court's rule.[10]

---

[9] *See Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 34 (D.C. Cir. 2001) (deferring to the NLRB's citation of a "company's decision to seek treble damages as *additional* evidence of retaliatory motive" but noting that "had the suit not been so meritless—our view might be different" (citing *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 235 (9th Cir. 1974) (characterizing antitrust treble damages as punitive))); *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 870, 877 (D.C. Cir. 1999) (characterizing treble damages under the False Claims Act as "a form of punitive damages that would be palpably inconsistent with state liability"); *Fleming v. FTC*, 670 F.2d 311, 314–15 (D.C. Cir. 1982) (concluding that a civil antitrust suit for treble damages constitutes an official law enforcement purpose under §§ 6(f) and 21(b)(6) of the Federal Trade Commission Improvements Act of 1980 because such suits are not only "remedial and compensatory in nature" but also "punitive or prophylactic"); *see also Pacificare Health Sys., Inc. v. Book*, 538 U.S. 401, 406–07 (2003) (leaving for the arbitrator the question whether an arbitration agreement which precluded punitive damages also barred treble damages under RICO).

[10] The ATA's legislative history confirms that the primary purpose of the statutory multiplier is to deter future acts of terrorism, not to punish the defendant's moral culpability. *See Antiterrorism Act of 1990*: *Hearing on S. 2465 Before the Subcomm. on Courts and Administrative Practice of the S. Judiciary Comm.*, 101st Cong. 34 (1990) (statement of Steven R.

The district court evaluated the Palestinian Authority's report and Qarmout's testimony under the false assumption that they would have to support "a conspiracy claim against the entire PA" to go to a jury. *Estate of Parsons*, 715 F. Supp. 2d at 34. Instead, the conspiracy of an individual PA employee acting within the scope of his employment suffices to make the PA itself liable. *See Wilson*, 757 F.2d at 1301. Under this standard, the Parsons family has alleged a conspiracy involving National Security personnel for which the Palestinian Authority may be held liable. I would reverse.

IV

In my experience, it is rare for three appellate judges to disagree with each other so thoroughly, but in this hard case it may be just as well. With only a narrow holding between us, we have at least avoided making bad law.

---

Valentine, Deputy Assistant Att'y Gen., Civil Division) ("[The ATA] provides a federal forum for any national of the United States to seek *compensation* in the form of treble damages for injuries resulting from acts of international terrorism"); *id.* at 85 (statement of Joseph A. Morris, President and General Counsel of the Lincoln Legal Foundation) ("[B]y its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of terrorism's lifeblood: money.").